UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEXON INSURANCE COMPANY,

      Plaintiff,

                                     Case No. 12-cv-13218
vs.                                HON. GERSHWIN A. DRAIN

AZIZ NASER,

      Defendants.

_____/

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [#28] AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [#18]**

**I.     INTRODUCTION**

On July 23, 2012, Plaintiff, Lexon Insurance Company ("Lexon"), filed the instant action. Lexon alleges Defendant, Aziz Naser ("Naser"), breached an Indemnity Agreement ("Agreement") the parties entered into on July 22, 2009.

Presently before the Court is Lexon's Motion for Summary Judgment, filed on July 18, 2013.[1] Also before the Court is Naser's Motion for Summary Judgment, filed on July 19, 2013. These matters are fully briefed and the hearing set for November 19, 2013 is cancelled. *See* E.D. Mich L.R. 7.1.(f)(2).

For the reasons that follow, the Court will DENY Lexon's Motion for Summary Judgment and DENY Naser's Motion for Summary Judgment.

_____

[1] Lexon filed a corrected Motion for Summary Judgment on August 27, 2013. *See* Dkt. No. 28.

1

## II.   FACTUAL BACKGROUND

Naser founded Michigan Orthopedic Services ("MOS") in 1994. MOS operated a network of patient care facilities that provided prosthetic and orthotic services. Naser, a certified prosthetist and orthotist, ran the company, saw patients for evaluations and fittings, and was in charge of billings and getting billings approved by Medicare. In late 2007, Naser sold all or part of MOS to MOS Holdings, LLC ("MOS Holdings"). MOS Holdings was established by Huron Capital Partners LLC ("Huron"), a private equity firm, for the purpose of purchasing MOS. After the sale, Naser continued to have a relationship with MOS.

In July 2009, MOS submitted an application for Medicare provider surety bonds to VGM Insurance ("VGM"), a Lexon agent.[2] The application recognized the owner of MOS as MOS Holdings and also listed Naser's name, home address, and social security number ("SSN"). On September 1, 2009, Lexon, as surety, issued a series of bonds ("the Bonds") with MOS as principal. The Agreement stated:

> I agree to indemnify Lexon Insurance Company and/or Bond Safeguard Insurance Company (hereinafter "Surety") in connection with any bond executed on behalf of the person or entity named as "applicant" below. I certify that all the information provided is true, and acknowledge that Surety is relying on this information to issue a bond. I agree that proof of the falsity of any statement will be prima facie proof of material, intentional and fraudulent misrepresentation for all purpose of law and equity. I authorize Surety or its agent to investigate my credit, now and at any time in the future with any institution, person or entity. I further agree:
>
> *                             *                             *
>
> 2. To pay Surety all sums demanded by Surety to cover any liability, claim,

---

[2] In January 2009 Medicare billing regulations changed. 74 F.R. 198 (2009). Beginning October 2, 2009, Durable Medical Equipment Prosthetic and Orthotic Suppliers ("DMEPOS") such as MOS, are required to obtain and maintain a surety bond in the minimum amount of $50,000 for each billing location. 42 C.F.R § 424.57(d)(2) (2012). Failure to comply with said regulation could result in the revocation of the DMEPOS supplier's Medicare billing privileges. *Id.*

suit or judgment against the bond, including any legal fees and expenses.
3. To hold harmless and indemnify Surety from any and all liability, damages, loss, costs and expenses of every kind, including the attorney fees, which may be sustained or incurred arising out of the execution, enforcement, procurement of release, or other action involving the application and/or issuance of the bond.

    *                       *                      *

5. That Surety has the exclusive right to defend, settle, pay or appeal any claim, and an itemized statement of loss and expense incurred by Surety shall be prima facie evidence of the fact and extent of any liability to Surety.

Naser signed the Agreement twice. First, Naser printed his name, signed, and dated under the applicant section of the Agreement where MOS is identified as the "applicant." In the typewritten section adjacent to his printed name labeled "Title," Naser wrote "CEO."

Naser's second signature appears in a signature block immediately below the application section and the statement - "[i]n consideration of the execution by the Surety of the bond herein applied for, the undersigned owners, jointly and severally, join the foregoing indemnity agreement. MUST BE SIGNED BY A CORPORATE OFFICER." Following the directions is a three-line signature block for the "Authorized Corporate Officer" of MOS Holdings. One line was for the authorized officer to print his name, one line was for his signature, and one line was for him to identify his title. John C. Higgins ("Higgins"), President of MOS Holdings, fully completed the Authorized Corporate Officer section. Following Higgins' signature was a signature block for Naser, which also contained three lines: one for Naser to print his name above his typewritten name, a signature line, and a line requesting Naser's SSN. Naser fully completed his personalized signature block. The Agreement was faxed to Lexon on July 23, 2009.

On August 3, 2011 MOS filed for bankruptcy under Chapter 7 of the Bankruptcy Code. Beginning on March 15, 2012 the Centers for Medicare & Medicaid Services ("CMS")

began issuing claims against Lexon's bonds pursuant to the requirements of 42 C.F.R. 424.57(e).[3] On May 8, 2012 Lexon sent a letter to Naser regarding CMS' claims against the Lexon's bonds. The letter referenced the Agreement and indicated Naser's personal responsibility for non-payment of $256,913.64. Lexon further requested that Naser provided Lexon with any documentation or evidence that would prove the validity of Naser's defense. Naser responded the next day, May 9, 2012, with a request for a copy of the Agreement, which he initially denied ever seeing or signing. Lexon provided the requested documents.

On May 23, 2012 Lexon notified Naser that they "had a 30 day window in which to pay these claims" and had no alternative but to immediately pay them.[4] Naser replied with an assertion that the claims were false and requested that Lexon delay payment. Ultimately, Lexon paid the $256.913.64 to CMS and subsequently initiated the following action seeking reimbursement from Naser.

## III.    LAW AND ANALYSIS

### A.    Standard of Review

Federal Rule of Civil Procedure 56(a) permits a party to:

> [M]ove for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[3] Failure to meet standards. CMS will revoke a suppliers billing privileges if it is found not to meet the standards in paragraphs (b) and (c) or this section. (The revocation is effective 15 days after the entity is sent notice of the revocation...)."

[4] Under 42 C.F.R. § 424.57 (d)(5)(i) the surety bond provided by Lexon was required to "guarantee that the surety will, within 30 days of receiving written notice from CMS containing sufficient evidence to establish the surety's liability under the bond of unpaid claims, CMPs or assessments, pay CMS a total up to the full penal amount of the bond..."

matter of law.

The Supreme Court has affirmed the use of summary judgment and recognized it as an integral part of the fair and efficient administration of justice. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party seeking summary judgment "bears the initial burden of specifying the basis upon which it contends judgment should be granted and of identifying that portion of the record which, in its opinion, demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 322. The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The burden then shifts to the non-moving party to produce "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968). The evidence presented must be such on which a jury could reasonably find for the defendant; mere denials, unsupported allegations, or speculations will not be enough to meet this burden. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B.   Lexon's Motion for Summary Judgment

Lexon argues that Naser's failure to indemnify Lexon is a breach of the Agreement. In support, Lexon relies on the unambiguous language of the Agreement and extrinsic evidence.

#### 1.   Plain Language

Under Michigan law, "an indemnity contract is construed in the same fashion as are contracts generally." *Zurich Ins. Co. v. CCR and Co.*, 226 Mich. App. 599, 603 (1997). The

5

law presumes that parties entering into a contract understand the terms and manifestations of the agreement. *Birchcrest Building Co. v. Plaskove*, 369 Mich. 631, 637 (1963). Where a contract is to be construed solely by its terms, it is the responsibility of the court to interpret it; however, where a contract's "meaning is obscure and its construction depends upon other and extrinsic facts in connection with what is written, the question of interpretation should be submitted to the jury." *O'Connor v. March Automatic Irr. Co.*, 242 Mich. 204, 210 (1928).

An insurance contract is considered ambiguous "when its provisions are capable of conflicting interpretations." *Farm Bureau Mut. Ins. Co. of Michigan v. Nikkelo*, 460 Mich. 558, 566 (1999). When such conflict exists, "courts cannot simply ignore portions of a contract in order to avoid a finding of ambiguity or in order to declare an ambiguity." *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 467 (2003). If the contract is ambiguous, then "the court can look to such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practice to aid in interpretation." *Penzien v. Dielectric Products Engineering Co.*, 374 Mich. 444, 449 (1965). Contractual ambiguities do "not automatically preclude summary judgment if the evidence of intent is undisputed." *Lomree, Inc. v. Pan*, 499 Fed. Appx. 417, 421 (6th Cir. 2012).

Both parties agree that the Agreement is unambiguous. However, such a contention is completely undermined by the parties' differing interpretations as to the plain language of the contract. *See* Dkt. No. 18 at 15, 28 at 19. Lexon moves for Summary Judgment on the basis that the unambiguous language of the Agreement establishes that Naser personally bound himself as an indemnitor. Naser asserts that the same language did not bind him as an individual, but only as a representative of MOS.

6

Lexon supports its argument by pointing to the fact that Naser signed the contract without indicating he was doing so in a representative capacity and included his SSN. It is arguable whether substituting a SSN for a title indicates clear intent of signing as an individual rather than for the company. Additionally, Lexon points to the fact that Naser signed the document twice. In *Livonia Bldg. Materials Co. v. Harrison Constr. Co.*, 276 Mich. App. 514, 524 (2007), the Court recognized a universal practice that an officer will sign such a contract twice when individual responsibility is demanded - once as an officer of the entity and once as an individual. Lexon stresses that it would be illogical to consider both signatures on behalf of the corporation because there is no need for the company to sign twice to enter into the same contract once. Furthermore, Naser signed directly under the statement identifying the signers as "undersigned owners." There is no dispute that the Agreement identifies Naser's company MOS as the applicant. "The defendant's signature without any designation of agency...indicate[s] that the defendant meant to be personally bound." *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 316 (6th Cir. 1998).

Naser opposes Lexon's argument by stating that he signed the Agreement solely as an authorized officer of MOS. In support, Naser alleges that there is nothing in the document to provide any clear indication that he provided a personal guarantee. Naser attempts to refute *Livonia* by pointing out that *Livonia* based its decision on *Salzman Sign Co. v. Beck*, 10 N.Y.2d 63 (1961). *Salzman* held that "an agent for a disclosed principal 'will not be personally bound unless there is clear and explicit evidence fo the agent's intention to substitute or superadd his personal liability for, or to, that of his principal.'" *Id.* at 67. While the plain language of the Agreement states the "undersigned **owners**" (emphasis added), Naser argues that he was not the owner of MOS at the time the Agreement was

7

entered into, but was only an agent for MOS Holdings.

Naser argues that signing the document twice is not automatically indicative of a personal guarantee, relying on *Bonnant v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 467 Fed. Appx. 4, 11 (2d Cir. 2012), where the Court held:

> If the contract is the corporation's contract and the representative's first signature is as the corporation's representative, the corporation's representative who signs twice is not liable under the contract unless the second signature is in a context showing that the representative is agreeing to assume personal responsibility. The mere fact of signing twice says no such thing.

However, in *Bonnant* the corporation's representative simply signed above a line captioned "Signature (Accountholder)" where as in the case at hand, Naser's SSN was requested and provided.

The Court finds the plain language of the Agreement to be ambiguous, particularly given the extreme differences in interpretation between the parties. Since the Court finds the Agreement to be ambiguous, it may consider extrinsic evidence such as "the parties' conduct, the statements of its representatives, and past practice to aid in interpretation." *Penzien*, 374 Mich. at 449.

2.   Extrinsic Evidence

In *Andersons*, 166 F.3d at 316,  the Court recognized that where "anything on the face of the paper suggests a doubt to the party bound...testimony may be admitted...to show the true intent." When some aspects of the contract indicate defendant is personally bound and others suggest the signing was solely on behalf of the company, "parol evidence should be admitted to show whom the parties intended to bind." *Id.* In the current case, both parties claim extrinsic evidence supports a reading of the Agreement in their favor.

Lexon begins by pointing out that Naser is an indemnitor, not a guarantor. A

8

guarantor enters into an obligation to pay a debt, perform a service, or compensate for the obligations that another (the primary debtor) is committed to with a third party in the case that the primary debtor defaults. In contrast, an indemnitor enters into a contract with a third party to perform another's obligations if called upon to do so by the third party, whether the other has defaulted or not. Lexon alleges Naser is an indemnitor and therefore has a primary liability triggered by a loss on the bonds. Under this theory, Lexon argues that the affidavits Naser points to in support, Jason Villeneuve ("Villeneuve"), MOS' Controller, Dennis Durco ("Durco"), MOS' CEO, and Timothy E. Morgan ("Morgan"), an independant contractor for MOS, are all irrelevant in regards to their interpretations and expectations of the Agreement because they only refer to such considerations in regards to Naser's capacity as a guarantor. Lexon is not asserting that Naser owes it duties as a guarantor, but as an indemnitor. VGM's testimony indicated it intended to have Naser sign in his individual capacity and this intent was displayed by the fact that the Agreement was prepared with a second signature block in Naser's name and without a title or line for a title. Additionally Lexon claims Morgan's affidavit should be precluded under Fed. R. Civ. P. 37(c) because Naser failed to disclose Morgan.[5]

It is unclear exactly what position Naser held in MOS at the time the Agreement was entered into. While Lexon contends Naser only sold a portion of MOS to MOS Holdings in 2007 and could therefore sign the Agreement as an owner attaching personal indemnity,

---

[5] Naser admitted to failing to disclose Morgan. Fed. R. Civ. P. 37(c) states "[i]f a party fails to provide information or identify a witness as required by Fed. R. Civ. P 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

9

Naser states that he sold 100% of the company and consequently had no reason or motivation to sign in an individual capacity. However, the document Naser produced in support of the sale of MOS is questionable. Naser does not provide the contract in its entirety, nor are there any signatures on the portion that he does provide. Additionally, Naser has contradicted himself as to his relationship with MOS. Initially Naser stated that he signed the Agreement as an authorized corporate officer of MOS. *See* Dkt. No. 21 at 13. However, later in the same brief, Naser claims that after the sale, MOS Holdings kept him on only as a figurehead and officer in name only. *See* Dkt. No. 21 at 3, 19. Determining ownership of the company is a material fact in interpreting the "undersigned owners" portion of the Agreement.

Finally, Lexon points to extrinsic evidence that the United States had multiple claims against Naser from January 1, 2004 until December 31, 2007 under the False Claims Act, 31 U.S.C. § 3729, *et seq.* (2011), and related Medicare regulations. *See* Dkt. No. 21 at 2. Naser argues these claims are irrelevant and have been resolved, however, it is not up to a defendant to determine what information is relevant and necessary to produce.

In response, Naser points to the process in which his signature was obtained as well as numerous affidavits and testimony in his favor. Naser states that it was never his intent to sign, nor would he have ever signed an indemnity provision making him personally liable for MOS. Not only was there not a representative from Lexon present at the time of the signing, but Naser alleges that he was never asked to sign individually and no one at MOS believed that to be the case either. In support, Naser points to the Villeneuve affidavit, which states that Naser only signed as a CEO, a title he held for marketing purposes, and not to personally guarantee anything. Durco's affidavit states that there was no reason for

10

Naser to personally guarantee anything, nor would Durco have ever requested such. Finally, Michael Beliniski ("Beliniski"), Lexon's collection attorney, testified that he had never seen the particular form of Agreement of Indemnity that Lexon used in this case. Instead, Beliniski has traditionally seen Lexon use a 3-page long agreement that spells out the obligations of the indemnitors and clearly distinguishes between those signing on behalf of an individual and those signing on behalf of a corporation.

Given the significant questions of material facts that remain. Lexon's argument lacks merit and should be denied.

### C.    Naser's Motion for Summary Judgment

For the same reasons described above, Naser's Motion for Summary Judgment based on the plain language and/or extrinsic evidence must be DENIED.

Naser's additional argument is that Lexon never should have made the payments to the CMA in the first place. Instead, Lexon should have followed Naser's recommendation to conduct a more thorough investigation into what Naser believed to be fraudulent claims. Sufficient evidence is required to establish a surety's liability.[6] If sufficient evidence was not established, MOS would not have been liable and Lexon never should have paid the funds in the first place. The only evidence Lexon received was six virtually identical demand letters that included a spreadsheet alleging the amount overpaid, the interest, and the overpayment allegedly repaid by MOS. However there was no indication of what patients the payments belonged to. As soon as Naser heard about the claims he told Lexon not to pay them because they were invalid.

---

[6] For example, documents sufficient to establish that MOS received Medicare funds in excess of the amount due.

11

Lexon admitted it relied on the spreadsheets in making its determination regarding the claims, however it could not say where the spreadsheet came from or how CMS determines what services were rendered. Kim Marsilio ("Marsilio"), a Lexon representative, admitted the spreadsheet "provided no information correlating the alleged overpayment with particular services provided to a particular patient and actually provided no way of determining whether the alleged overpayments even related to MOS."

As previously mentioned, Lexon maintains it requested documentation from Naser to investigate a defense against CMS, however nothing was provided. Additionally, Lexon refers to the fact that it was legally bound to pay such claims within a certain amount of time 42 C.F.R § 424.57(d)(5)(1). As with his first two arguments, Naser's third argument fails to establish a lack of dispute as to material facts and therefore does not support a grant of summary judgment.

## III.   CONCLUSION

For the above stated reasons, the Court will DENY Lexon's Motion for Summary Judgment [#28]. It Is Further Ordered that the Court will DENY Naser's Motion for Summary Judgment [#18].

SO ORDERED

Dated: November 19, 2013                    /s/ Gershwin A. Drain
                                            GERSHWIN A. DRAIN
                                            UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

12

Copies of this Order were served upon attorneys of record on
November 19, 2013, by electronic and/or ordinary mail.

/s/ Tanya Bankston
Deputy Clerk