UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEXON INSURANCE COMPANY,

    Plaintiff,

vs.

Case No. 12-cv-13218
HON. GERSHWIN A. DRAIN

AZIZ NASER,

    Defendants.
_____/

### ORDER DENYING PLAINTIFF'S MOTIONS *IN LIMINE* [#41]

**I.    INTRODUCTION**

On July 23, 2012, Plaintiff, Lexon Insurance Company ("Lexon"), filed the instant action. Lexon alleges Defendant, Aziz Naser ("Naser"), breached an Indemnity Agreement (the "Agreement") the parties entered into on July 22, 2009.

Presently before the Court is Lexon's Motion *in Limine* [#41], filed on November 22, 2013. This matter is fully briefed. A Response was filed on December 5, 2013, and a Reply was filed on December 11, 2013. The hearing set for January 6, 2014 is cancelled. *See* E.D. Mich L.R. 7.1.(f)(2).

For the reasons that follow, the Court will DENY Lexon's Motions *in Limine*.

**II.    FACTUAL BACKGROUND**

Naser founded Michigan Orthopedic Services ("MOS") in 1994. MOS operated a network of patient care facilities that provided prosthetic and orthotic services. Naser, a certified prosthetist and orthotist, ran the company, saw patients for evaluations and fittings,

1

and was in charge of billings and getting billings approved by Medicare. In late 2007, Naser sold all or part of MOS to MOS Holdings, LLC ("MOS Holdings"). MOS Holdings was established by Huron Capital Partners LLC ("Huron"), a private equity firm, for the purpose of purchasing MOS. After the sale, Naser continued to have a relationship with MOS.

In July 2009, MOS submitted an application for Medicare provider surety bonds to VGM Insurance ("VGM"), a Lexon agent.[1] The application recognized the owner of MOS as MOS Holdings and also listed Naser's name, home address, and social security number ("SSN"). On September 1, 2009, Lexon, as surety, issued a series of bonds ("the Bonds") with MOS as principal. The Agreement stated:

> I agree to indemnify Lexon Insurance Company and/or Bond Safeguard Insurance Company (hereinafter "Surety") in connection with any bond executed on behalf of the person or entity named as "applicant" below. I certify that all the information provided is true, and acknowledge that Surety is relying on this information to issue a bond. I agree that proof of the falsity of any statement will be prima facie proof of material, intentional and fraudulent misrepresentation for all purpose of law and equity. I authorize Surety or its agent to investigate my credit, now and at any time in the future with any institution, person or entity. I further agree:
>
> \*      \*      \*
>
> 2. To pay Surety all sums demanded by Surety to cover any liability, claim, suit or judgment against the bond, including any legal fees and expenses.
> 3. To hold harmless and indemnify Surety from any and all liability, damages, loss, costs and expenses of every kind, including the attorney fees, which may be sustained or incurred arising out of the execution, enforcement, procurement of release, or other action involving the application and/or issuance of the bond.
>
> \*      \*      \*
>
> 5. That Surety has the exclusive right to defend, settle, pay or appeal any

---

[1] In January 2009 Medicare billing regulations changed. 74 F.R. 198 (2009). Beginning October 2, 2009, Durable Medical Equipment Prosthetic and Orthotic Suppliers ("DMEPOS") such as MOS, are required to obtain and maintain a surety bond in the minimum amount of $50,000 for each billing location. 42 C.F.R § 424.57(d)(2) (2012). Failure to comply with said regulation could result in the revocation of the DMEPOS supplier's Medicare billing privileges. *Id.*

>claim, and an itemized statement of loss and expense incurred by Surety shall be prima facie evidence of the fact and extent of any liability to Surety.

Naser signed the Agreement twice. First, Naser printed his name, signed, and dated under the applicant section of the Agreement where MOS is identified as the "applicant." In the typewritten section adjacent to his printed name labeled "Title," Naser wrote "CEO."

Naser's second signature appears in a signature block immediately below the application section and the statement - "[i]n consideration of the execution by the Surety of the bond herein applied for, the undersigned owners, jointly and severally, join the foregoing indemnity agreement. MUST BE SIGNED BY A CORPORATE OFFICER." Following the directions is a three-line signature block for the "Authorized Corporate Officer" of MOS Holdings. One line was for the authorized officer to print his name, one line was for his signature, and one line was for him to identify his title. John C. Higgins ("Higgins"), President of MOS Holdings, fully completed the Authorized Corporate Officer section. Following Higgins' signature was a signature block for Naser, which also contained three lines: one for Naser to print his name above his typewritten name, a signature line, and a line requesting Naser's SSN. Naser fully completed his personalized signature block. The Agreement was faxed to Lexon on July 23, 2009.

On August 3, 2011 MOS filed for bankruptcy under Chapter 7 of the Bankruptcy Code. Beginning on March 15, 2012 the Centers for Medicare & Medicaid Services ("CMS") began issuing claims against Lexon's bonds pursuant to the requirements of 42 C.F.R. 424.57(e).[2] On May 8, 2012 Lexon sent a letter to Naser regarding CMS' claims against the

---

[2] Failure to meet standards. CMS will revoke a suppliers billing privileges if it is found not to meet the standards in paragraphs (b) and (c) or this section. (The revocation is effective 15 days after the entity is sent notice of the revocation...)."

Lexon's bonds. The letter referenced the Agreement and indicated Naser's personal responsibility for non-payment of $256,913.64. Lexon further requested that Naser provided Lexon with any documentation or evidence that would prove the validity of Naser's defense. Naser responded the next day, May 9, 2012, with a request for a copy of the Agreement, which he initially denied ever seeing or signing. Lexon provided the requested documents.

On May 23, 2012, Lexon notified Naser that it "had a 30 day window in which to pay these claims" and had no alternative but to immediately pay them.[3] Naser replied with an assertion that the claims were false and requested that Lexon delay payment. Ultimately, Lexon paid the $256.913.64 to CMS and subsequently initiated the following action seeking reimbursement from Naser.

## III.  LEGAL ANALYSIS

### A.  Standard of Review

Rules 401 and 402 of the Federal Rules of Evidence permit the admission of only relevant evidence. Evidence that is irrelevant is inadmissible. *See* FED. R. EVID. 402. Evidence is relevant if it has any tendency to make the existence of a material fact more or less probable than it would be without the evidence. *See* FED. R. EVID. 401. Rule 403 allows the admission of relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, undue delay, wasting time or needlessly presenting cumulative evidence. *See* FED.

---

[3] Under 42 C.F.R. § 424.57 (d)(5)(i) the surety bond provided by Lexon was required to "guarantee that the surety will, within 30 days of receiving written notice from CMS containing sufficient evidence to establish the surety's liability under the bond of unpaid claims, CMPs or assessments, pay CMS a total up to the full penal amount of the bond..."

R. E<small>VID</small>. 403. Unfair prejudice results when a piece of evidence "has an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

### B. Timothy Morgan

Lexon argues that Naser should be precluded from relying on Timothy Morgan's ("Morgan") affidavit or as a witness at trial. Naser self-admittedly failed to disclose Morgan in his F<small>ED</small>. R. C<small>IV</small>. P. 26(a) disclosures, did not identify Morgan as a witness in his witness list, and has not supplemented his Rule 26(a) disclosure since taking Morgan's affidavit. In support, Lexon emphasizes that under F<small>ED</small>. R. C<small>IV</small>. P. 26, each party must disclose those individuals likely to have discoverable material. Rule 37(c)(1) provides a mechanism for sanctioning a Rule 26 violation. F<small>ED</small>. R. C<small>IV</small>. P. 37(c)(1). Specifically, Rule 37 require strict compliance with Rule 26(a) and mandates that a district court impose sanctions, with the sole exception being if the violation is harmless or substantially justified. Lexon maintains that permitting Morgan to provide evidence in support of Naser's defenses is harmful to its position because Naser did not provide notice of Morgan as a witness until after discovery closed. Consequently, Lexon did not have a chance to depose Morgan.

In his affidavit, Morgan, an independent contractor for MOS, states that in conjunction with his position at MOS he was given the job of finding a company that would issue the CMS mandated surety bonds. Morgan testified that he contacted multiple companies, all of which required personal guarantees from MOS' corporate officers in conjunction with the issuance of a Medicare surety bond. Morgan maintains that Durco specifically told him that MOS' corporate officers were unwilling to sign personal guarantees for the bonds. When Morgan contacted VGM, he alleges that he was explicitly told that

VGM did not require personal guarantees in conjunction with the issuance of Medicare surety bonds. Therefore, MOS moved forward with VGM.

It is clear that Morgan's affidavit is a highly relevant piece of information, as the crux of the instant case is whether or not Naser signed as an individual, or on behalf of MOS. Morgan's affidavit is exactly the kind of relevant information discussed in Rules 401 and 402 of the Federal Rules of Evidence. Furthermore, beyond indicating that it did not have an opportunity to properly depose Morgan, Lexon does not provide any evidence of unfair prejudice. Consequently, it would be improper for the Court to preclude Naser from relying on Morgan as a witness at trial. To alleviate any minor prejudice to Lexon based on its inability to depose Morgan, the Court will permit Lexon to depose Morgan sometime before the new January 21, 2014 trial date.

### C. Naser's Ownership of Michigan Orthopedic

Next, Lexon requests that the Court preclude Naser from offering any evidence, documentary or testimonial, regarding his alleged transfer, in whole or part, of his ownership of MOS. Lexon's reasoning for the Court to enter sanctions on this matter includes allegations that: (1) Naser's conduct was intentional, (2) Naser cannot show that his failure to disclose or provide supplemental information regarding his ownership of MOS was justified, and (3) Naser cannot establish that his failure to disclose and/or supplement was harmless. Lexon maintains that Naser knew ownership was an issue in the instant case as early as August 2012.[4] Additionally, Lexon questions the validity of the 2-page

---

[4] At which time Naser's counsel apparently prepared two affidavits by Durco and Villenueve specifically stating that "at the time Naser signed the document, MOS was owned by MOS Holdings, not Naser."

"purchase agreement" Naser alleges terminated his ownership in MOS, and Naser's refusal to testify about the settlement or purchase agreement.

Alternatively, Naser argues that he was not an owner of MOS during the time period in question, and had not been since December 20, 2007 when he and his wife sold 100% of their interest in MOS to MOS Holdings. Naser maintains that the sale is abundantly clear in the first page of the purchase agreement that he provided Lexon, and the only reason he has withheld part of the purchase agreement is because it contains a provision that prevents Naser from providing notice to third parties of the economic terms of the agreement, other than that those released to the public. Similarly, Naser alleges that during his testimony, he did not refuse to provide any information regarding the purchase agreement, he simply refused to answer a very specific question regarding the purchase price.

As previously determined by this Court in its Order Denying Plaintiff's and Defendant's Motions for Summary Judgment [#40], "[d]etermining ownership of the company is a material fact in interpreting the "undersigned owners" portion of the Agreement." Dkt. No. 40 at 10. Consequently, like Morgan's testimony, Naser's ownership of MOS is the type of relevant, admissible evidence discussed in Rules 401 and 402 of the Federal Rules of Evidence. Because Naser's ownership of MOS is a critical element in interpreting the Agreement, the Courts will deny Lexon's Motion and permit evidence clarifying ownership at the trial.

### D. Validity of Bond Claims

Lexon argues that Naser should be precluded from offering any evidence regarding the validity of the United States bond claims against Naser. Naser has admitted to receiving

7

documents from the government regarding claims against him and allegations that MOS violated the False Claims Act by submitting billings for Medicare reimbursements for services that were not provided. While Naser argues that the claims are bogus and frivolous, Lexon maintains that Naser has not disclosed, produced, or supplemented his prior disclosures and productions supporting his argument. Instead, Lexon alleges that Naser has suppressed evidence regarding the claims and investigation and lied in his deposition about the status of the lawsuits filed against him. Lexon maintains that it is not up to a defendant to determine what information is relevant and necessary to produce.

Naser argues that Lexon should not have made any payments under the bonds, as CMS failed to provide "sufficient evidence" to establish Lexon's liability. Naser maintains that to receive payment from Lexon, CMS must first provide Lexon with documents sufficient to establish that MOS received Medicare funds in excess of the amount due and payable, as Lexon is not responsible if MOS itself would not have been responsible. Instead, all Lexon received were demand letters from CMS on the bonds and an unidentified spreadsheet. No other documentation or evidence was provided when Lexon paid the bonds. Naser claims he did everything to try and persuade Lexon to question the validity of the claims, but Lexon chose to move forward with payment. According to Naser, on all of the previous audits conducted on MOS, which ultimately established that there were either minimal or no overpayments, CMS provided MOS with documentation establishing why it believed overpayments had been made.

Additionally, Naser maintains that he is not withholding documents from Lexon, as the only documents needed to establish his defenses are the inadequate spreadsheets CMS provided to Lexon. Finally, Naser argues that he has not suppressed evidence

regarding the bond claims against him, however those claims are from 2004 to 2007 and have nothing to do with the current case. Moreover, Naser alleges that Lexon never issued a discovery request, and if it had done so Naser's counsel would have given Lexon sufficient documentation regarding the claims.

The evidence of the validity of the bond claims will be admissible under the relevant evidence allowance of FED. R. EVID. 403. Given the question of the validity of the claims, the preclusion of evidence would cause unfair prejudice to Naser as the fact-finder would potentially be mislead to assume that there was no question or doubt as to whether or not the underlying bond claims ever occurred.

### E. Affirmative Defense of Bad Faith

In Naser's Motion for Summary Judgment [# 18], he raised the argument[5] that Lexon was not provided sufficient evidence to warrant making payments under the bonds, and subsequently acted in bad faith. Lexon argues that the Court must preclude Naser from raising arguments regarding the breach of good faith as he did not raise that defense in his responsive pleadings, which caused the defense to be waived. In *Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004), the court held that "a response to a pleading must set forth any matter constituting an affirmative defense" and a failure to do so generally results in a waiver of the defense. *Id.*; *see Trav. Case. & Sur. of Am. v. J.O.A. Const. Co., Inc.,* 479 Fed. App'x. 684, 689-91 (6th Cir. 2012) (concluding that a breach of duty of good faith is an affirmative defense that is waived if not raised in responsive pleadings).

Naser alleges there is a duty of good faith inherent in every contract and Lexon

---

[5] This was the first time Naser raised a bad faith defense.

violated that duty in the instant case. *Burkhardt v. City National Bank of Detroit,* 57 Mich. App. 649, 652 (1975) (the court noted that "Michigan courts will recognize an action for breach of an implied covenant of good faith and fair dealing where 'a party to a contract makes the manner of its performance a matter of its own discretion'"). Consequently, Naser maintains that a duty to act in good faith accompanied Lexon's self-asserted claim that, given the contract, it had the "exclusive right to defend, settle, pay, or appeal any claim" involving MOS. Additionally, Naser alleges that he should be allowed to raise a good faith defense and that such a claim does not constitute an affirmative defense that is required to be raised in the first pleading, as duty to exercise a contractual right in good faith is not listed as an affirmative defense under FED. R. CIV. PRO. 8(c).

Accordingly, the Court will DENY Lexon's Motion to preclude Naser from raising an affirmative defense of good faith.

## IV. CONCLUSION

It Is Hereby Ordered that the Court will DENY Lexon's Motions *in Limine* [#41] as to (1) Timothy Morgan, (2) Naser's Ownership of MOS, and (3) the validity of the bond claims.

It Is Further Ordered that this Court will also DENY Lexon's Motion to preclude Naser from raising an affirmative defense of good faith.

It Is Further Ordered that the presently set trial date of January 14, 2014 is adjourned until January 21, 2014 at 9:00 a.m.

SO ORDERED

Dated: December 26, 2013          /s/ Gershwin A. Drain
                                  GERSHWIN A. DRAIN
                                  UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
December 26, 2013, by electronic and/or ordinary mail.

/s/ Tanya Bankston
Deputy Clerk