UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEXON INSURANCE COMPANY,

                Plaintiff,

                                          Case No. 12-13218
                                          Honorable Gershwin A. Drain

v.

AZIZ NASER,

                Defendant.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.      INTRODUCTION**

      Plaintiff, Lexon Insurance Company ("Lexon"), filed the instant Complaint against Defendant, Aziz Naser ("Naser"), on August 23, 2012, alleging Naser breached an Indemnity Agreement ("Agreement") the parties entered into on July 22, 2009. Naser argues that he only signed the Agreement as an authorized officer of Michigan Orthopedic Services ("MOS") and is therefore not independently liable to Lexon. This Court conducted a bench trial on March 11, 2014.

**II.      FINDINGS OF FACT**

      This is a diversity case brought under 28 U.S.C. § 1332.

      Lexon initiated this case against Naser alleging breach of a written indemnity agreement relating to claims Lexon paid under several Medicare Bonds issued by Lexon on behalf of MOS and in favor of the Centers for Medicare and Medicaid Services ("CMS")

1

as agent of the United States government.

Naser founded MOS in 1994.

MOS operated a network of 11 patient care facilities that provided prosthetic and orthotic services.

In January 2009, Medicare billing regulations changed. 74 F.R. 198 (2009). Beginning October 2, 2009, Durable Medical Equipment, Prosthetics and Orthotics Suppliers ("DMEPOS"), such as MOS, were required to obtain and maintain a surety bond in the minimum amount of $50,000 for each billing location. 42 C.F.R. § 424.57(d) (2012). Failure to comply with said regulation could result in the revocation of the DMEPOS Medicare billing privileges.

On July 16, 2009, MOS submitted an application for Medicare provider surety bonds (the "Application") to VGM Insurance ("VGM"), a Lexon agent.

The Application contained a section requesting the applicant's ownership information, which MOS explained as follows:

> This is an LLC and Michigan Orthopedic Services is owners by MOS Holdings, Inc. MOS Holdings-80% Aziz Naser 5475 Middlebelt Rd. West Bloomfield, MI 48323 SSN:XXX-XX-XXXX 15%.

Naser's social security number appears in the application, but is reflected as XXX-XX-XXXX here for privacy purposes.

Based on that application, VGM prepared an indemnity agreement, which stated, in part, that:

> AGREEMENT OF INDEMNITY
> PLEASE READ CAREFULLY
>
> I agree to indemnify Lexon Insurance Company and/or Bond Safeguard Insurance Company (hereinafter "Surety") in connection with any bond executed on behalf of

2

the person or entity named as "applicant" below. I certify that all the information provided is true, and acknowledge that Surety is relying on this information to issue a bond. I agree that proof of the falsity of any statement will be prima facie proof of material, intentional, and fraudulent misrepresentation for all purposes of law and equity. I authorize Surety or its agent to investigate my credit, not and at any time in the future with any institution, person or entity. I further agree.

1.   To pay Surety all premium or premiums due, until satisfactory evidence that Surety's liability is terminated, and agrees that such premium is fully earned upon issuance of a bond and is not refundable in the first year of coverage.

2.   To pay Surety all sums demanded by Surety to cover any liability, claim, suit or judgment against the bond, including any legal fees and expenses.

3.   To hold harmless and indemnify Surety from any and all liability, damages, loss, costs and expenses of every kinds, including attorney fees, which may be sustained or incurred arising out of the execution, enforcement, procurement of release, or other action involving the application and/or issuance of the bond.

4.   To pay interest, at the highest legal rate allowed, in the event of any payment by Surety, from the date such payments are made

5.   That Surety has the exclusive right to defend, settle, pay or appeal any claim, and an itemized statement of loss and expense incurred by Surety shall be prima facie evidence of the fact and extent of any liability to Surety.

6.   That Surety may decline to become a surety on any bond, may cancel or amend any bond with or without cause, alter the penalty, terms and conditions of any bond, complete any blanks contained in the application or indemnity agreement at the time or execution or procure its release from said suretyship under any law for reason or sureties, all without liability to Surety thereon.

7.   To provide Surety with cash or other property acceptable to Surety, upon demand as collateral security for any loss reserve. Surety may hold such collateral security until it has determined that it is no longer exposed to a loss and may retain or sell the collateral security to reimburse itself.

8.   That a facsimile copy of this agreement shall be considered an original and shall be admissible in a court of law to the same extent as the original agreement.

9.   This agreement shall apply to all renewals, continuations, substitutions and extensions fo the surteyship herein applied for.

3

Below the language appears an applicant section, which identified the applicant as MOS. Further, MOS is identified as a limited liability company. A date line follows indicating the date of July 22, 2009. Immediately below that appears a line for the applicant's signature, which was signed by Naser, and adjacent to which is a line requesting the signatory's "Title" on which Naser wrote the title "CEO."

Immediately below the applicant section appears the following language: "In consideration of the execution by the Surety of the bond herein applied for, the undersigned owners, jointly and severally, join the foregoing indemnity agreement."

Below that language appears the language "MUST BE SIGNED BY A CORPORATE OFFICER."

Two additional signature blocks appear below that information.

The first signature block requests information and execution by the Authorized Corporate Officer of MOS Holdings. This signature block contains a line requesting the identify of the "Authorized Corporate Officer" of "MOS Holdings," a signature line for the authorized corporate officer, and a line for the authorized corporate officer to print his title directly below his signature.

The second signature block is a personalized signature block which requested Naser's signature and social security number. That signature block included a line for Naser to print his name above his typewritten name, a line on which to affix his signature, and a line on which to write his social security number directly below his signature.

On or about July 16, 2009, VGM transmitted the indemnity agreement to MOS.

Neither MOS, MOS Holdings, Naser, nor anyone acting on their behalf contacted VGM regarding the form, content, information, nor manner of execution requested by the

4

Agreement, which suggests that the Agreement was drafted according to the parties understanding and intent.

On July 23, 2009, MOS transmitted two copies of the signed Agreement to VGM.

One of the versions contained the completed signature block for the Authorized Corporate Officer of MOS Holdings, which was completed by John C. Higgins ("Higgins"), as follows: he printed his name above the line stating "Authorized Corporate Officer MOS Holdings," printed "Inc." adjacent to "MOS Holdings," signed his name, and printed "President" in the line requesting his title.

The other copy included the completed personalized signature block for Naser, which he completed by: printing his name above his typewritten name, signing his name on the line requesting his signature, and printing his social security number on the line requesting that information.

On September 1, 2009, Lexon, as surety, issued a series of bonds (the "Bonds") with MOS as principal.

The Bonds contain the same substantive information, with the exception of each bond reflecting the address and Provider Transaction Access Number ("PTAN#") for the specific location of MOS to which each individual bond relates.

Under 42 C.F.R. § 424.57(d)(5)(I), the Bonds provided by Lexon were required to "guarantee that the surety will, within 30 days of receiving written notice from CMS containing sufficient evidence to establish the surety's liability under the bond of unpaid claims, CMPs or assessments, pay CMS a total up to the full penal amount of the bond..."

On August 3, 2011, MOS filed for bankruptcy under Chapter 7 of the Bankruptcy Code.

5

Beginning on March 15, 2012, CMS began issuing claims against Lexon's bonds pursuant to the requirements of 42 C.F.R. § 424.57(d) ("Claims").

CMS identified the basis for the Claims as MOS' receipt of overpayments for services that were not rendered pursuant to a post pay probe conducted by the Medicare Program Safeguard Contractor ("PSC"), and included spreadsheets attached to each claim correlating the amount and date of overpayment with the bond number and PTAN number for each location of MOS to which the claims related.

On May 8, 2012, Lexon sent a letter to Naser notifying Naser of the Claims and identifying his personal obligation to indemnify Lexon.

The letter referenced the Agreement and indicated Naser's personal responsibility for non-payment of $256,913.64.

Lexon further requested that Naser provide Lexon with any documentation or evidence that would prove the validity of Naser's defense, as follows:

> To enable Lexon Insurance Company to properly investigate this claim, please provide me with any and all documents and other evidence that proves the validity of your defenses. We request that you supply this information within **FIVE (5) DAYS** of receipt of this letter.

On May 9, 2012, Naser responded to a telephone call from Lexon during which Naser claimed he never signed anything individually while contemporaneously requesting a copy of the Agreement.

Lexon provided the requested documents.

Naser did not provide Lexon with any documentation or evidence with which Lexon could defend the Claims.

On May 23, 2012, Lexon notified Naser that they "had a 30 day window in which to

6

pay the claims" and had no alternative but to immediately pay them.

Naser replied with an assertion that the claims were false and requested that Lexon delay payment.

Ultimately, Lexon paid $256,913.64 to CMS and subsequently initiated the following action seeking reimbursement from Naser.

## III.   CONCLUSIONS OF LAW

Lexon's claim is based on diversity jurisdiction, under 28 U.S.C. § 1332, and alleges that Naser is liable to Lexon for breaching the indemnity agreement. Lexon bears the burden of proof on its claims and Naser has the burden of proof as to his affirmative defenses. *Trav. Cas. & Sur. Co. of Am. v. J.O.A. Const. Co., Inc.*, 479 Fed. Appx. 684, 689-91 (6th Cir. 2012). Naser admitted signing the indemnity agreement and does not dispute that the claims were made against Lexon's bonds, that he has not indemnified Lexon, that Lexon paid the Claims, or the amount of Lexon's payments. Rather, Naser's position is that although he signed the Agreement as an individual, it was not his intent to be individually obligated to indemnify Lexon, and, alternatively, that he should not be liable because Lexon allegedly paid the Claims in bad faith.

Naser's argument that he intended to sign the Agreement as an authorized corporate officer (CEO) of MOS is factually and legally without merit. Naser's argument is factually inconsistent with the undisputed fact that MOS is a limited liability company and not a corporation. Naser acknowledge that he admitted he founded "Michigan Orthopedic Services, **LLC**" (emphasis added), and limited liability companies have managers or members, not "corporate officers." *See* MICH COMP LAWS 450.4401 (2014) ("Unless the articles of organization state that the business of the limited liability company is to be

7

managed by 1 or more managers, the business of the limited liability company shall be managed by the members...”). Furthermore, evidence created at or around the time the Agreement was executed clearly identifies MOS Holdings, Inc. as the only corporate indemnitor contemplated by the parties. Naser does not argue that he signed, or had authority to sign, as an officer of MOS Holdings, and such an argument would not change the outcome as there would be no reason for two officers of MOS Holdings to agree, on behalf of MOS Holdings, to indemnify Lexon.

Contrary to his position, Naser admitted that he was not an authorized corporate officer of MOS, but testified that he was “an officer of the company in name only.” Similarly, affidavit’s provided by Naser’s witnesses state that Naser’s “involvement in MOS was more of a figurehead,” that he had the “role of a consultant,” he had the “title of CEO for marketing,” and that MOS was, in fact, “being operated and controlled by Huron Capital.” Further, Naser provided no documentary evidence suggesting he had such authority, such as, operating agreements, consent of the members of MOS, or any documents creating an agency relationship.

Naser’s argument lacks legal merit. The substance of Naser’s argument is that the intent manifested by his conduct should be disregarded and that his liability should be determined solely on his undisclosed intent. However, “[i]t is beyond doubt that the actual mental processes of the contracting parties are wholly irrelevant to the construction of contract terms.” *Burkhardt v. Bailey*, 260 Mich. App. 636, 657; 680 N.W.2d 453 (2004). “Rather, the law presumes that the parties understand the import of a written contract and had the intention manifested by its terms.” *Id*. In that context, the parties’ intent is clear, The Agreement included Naser’s personalized signature block, which contained a line for him

8

to print his name above his typewritten name, a signature line, and a line for Naser to write his social security number. Naser does not dispute that he completed that signature block as requested. Further, Naser completed his personalized signature block without modifying the Agreement or adding any designation of agency. Naser's "signature without any designation of agency...indicate[s] that [Naser] meant to be personally bound." *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 316 (6th Cir. 1998).

Naser's intent to be personally bound is underscored by the language the "undersigned owners," which reflects the intent for the owners of MOS, rather than MOS itself, to join in the indemnity agreement to which MOS is already a party. In other words, Naser's suggestion that he executed his personalized signature block as an officer of MOS is unsupportable because such an interpretation renders parts of the Agreement a nullity, leading to the illogical conclusions that MOS was entering into an agreement, jointly and severally, with itself. Construing the Agreement in that manner is inconsistent with the rules of contract interpretation. *See Zurich Ins. Co. v. CCR and Co.*, 226 Mich. App. 599, 608; 576 N.W.2d 392 (1997). To avoid such a result, Naser attempted to show that he was not, in fact, an owner of MOS at the time he signed the Agreement, but rather conveyed 100% of his interests in MOS to MOS Holdings on December 20, 2007. However, Naser's position is undermined by the Agreement and extrinsic evidence created at or around the time the Agreement was executed. The Agreement contained a certification by which each entity signing the Agreement certified that the information provided was true. There is no dispute that MOS, MOS Holdings, and Naser signed the Agreement. As stated above, those signatures create legal presumptions that those parties read, understood, and agree to this certification. *See Burkhardt*, 260 Mich. App. at 656 ("the law presumes that the parties

9

understand the import of a written contract and had the intention manifested by its terms");
*Stout v. J.D. Byrider*, 228 F.3d 709 (6th Cir. 2000) ("One who signs a contract is presumed
to know its contents, and...is bound by its provisions"). Naser did not offer any evidence to
rebut the presumption that all of the parties which signed the Agreement, MOS, MOS
Holdings, and Naser, read and understood the terms of the Agreement. As a result, it is
presumed that those parties read, understood, and agreed to the certification in the
Agreement.

The certification is notable when considered in the context of the surety application
submitted by MOS, which initiated the relationship between these parties. The application
clearly identified MOS' owners as MOS Holdings and Naser. In that respect, Naser's name,
home address, social security number, and percentage of ownership (15%) was identified.
Naser does not dispute that MOS and MOS Holdings signed the Agreement, and that the
Agreement contained the certification identified above. That means that (1) MOS certified
that it was owned by MOS Holdings and Naser, and that (2) MOS Holdings certified that
it and Naser were co-owners of MOS. Further, Naser's own signature on the Agreement
was a certification that he was an owner of MOS. In other words, at the time the Agreement
was executed MOS, MOS Holdings, and Naser all certified that Naser was an owner of
MOS. Now, years later, Naser takes a different position. At trial, Naser argued that despite
the evidence created around the time that the Agreement was signed, he was not an owner
of MOS at the time he signed the Agreement. To that end, Naser claims that on December
20, 2007, he conveyed 100% of his interests in MOS to MOS Holdings. In support of his
contention, Naser offered a two page document titled "Purchase and Membership
Contribution Agreement," a purported assignment, his own post-deposition affidavit, and

10

other documents created after this litigation ensued.

Naser, however, did not produce or disclose the purchase agreement or assignment as required by Federal Rule of Civil Procedure 26, the parties written agreement to voluntarily produce such documents without the need for written discovery, or in response to Lexon's document request (duces tecum). Well after discovery closed, and without any supplementation, Naser relied on the purchase agreement during motion practice regarding the parties' cross-motions for summary judgment, which this Court denied. Thereafter, Lexon filed a motion in limine requesting this Court to preclude these documents and Naser from testifying on the issue of his ownership of MOS under FED. R. CIV. P. 37, because his reliance on undisclosed documentary evidence coupled with his contradictory post-deposition affidavit indicated that Naser has intentionally failed to disclose and produce relevant information on this subject in an attempt to ambush Lexon.

The documents Naser has provided are questionable. Naser has only provided parts of documents while omitting material information such as the signature page and the actual terms of the purported transaction. The limited part that was provided is dated December 20, 2007, but contemplates that the "Closing," which appears to be a defined term, the definition of which Naser omitted, will occur, if ever, "[u]pon the terms and subject to the satisfaction fo the conditions contained in this Agreement." Naser, however, omitted the portions of the document that defines the term "Closing" and the portions of the document identifying the terms and conditions which must occur in order to make the purchase agreement operative. Naser did not offer any additional evidence on those points. As a result, it is impossible to determine if any such sale was actually consummated and, if so, the timing and form of such sale. Naser's argument regarding the importance of those

11

documents is further undermined by his own admissions. For example, Naser testified that he was an owner of MOS, owning "somewhere around 20 [percent]" after the Closing, and that his last official paycheck from MOS came in "December of 2010 or maybe November 2010." The testimony establishes that Naser was an owner of MOS through at least late 2010, which is more than one year after signing the Agreement.

Naser's argument is also inconsistent with documents he signed in a different lawsuit, relating to claims by the United States against Naser under the federal False Claims Act arising from Naser, as an owner of MOS, having allegedly caused Medicare to issue reimbursements to MOS for services that were not actually provided to MOS' patients. The claims in that lawsuit related to the time period from "January 1, 2004 through December 31, 2007." The recitals in the settlement agreement state that "Aziz Naser and Judy Naser were, at relevant times, owners and officers of Michigan Orthopedic Services, LLC." In other words, the settlement agreement reflects that Naser was an owner of MOS through at least December 31, 2007. That settlement agreement was signed by Naser, his wife, and his counsel, and were ultimately filed in another lawsuit pending in this Court. That is effectively "conclusive evidence of the fact stated." *See Detroit Grand Part Corp. v. Turner*, 316 Mich. 241 (1946). In the present case, when Naser was confronted with this settlement agreement he confirmed in his briefing that the United States' claims "related solely to the period from January 1, 2004 to December 31, 2007." In context, that is effectively a judicial admission that Naser was an owner of MOS after December 20, 2007. *See U.S. v. Burns*, 109 Fed. Appx. 52 (6th Cir. 2004) (holding that statement in the brief was a judicial admission).

Naser attempted to rebut his admissions with his post-deposition affidavit, which, in

effect, made his testimony inconsistent. The documentary evidence created around the time the Agreement was executed does not support his recent position.

Naser similarly relied on various affidavits that are wholly deficient. In large part, those documents are not notarized, which means that they are not sworn testimony and there is no confirmation that they were signed by the purported affiant. Naser did not offer any explanation why these documents were not notarized, despite them clearly being prepared during the course of this litigation. Further, these documents refer to an attached Agreement of Indemnity, but no such documents are attached. That is important because Lexon's claim is based on the Agreement signed by Naser, but there is a similar indemnity agreement in this case signed solely by MOS Holdings' corporate officer Higgins. In other words, the evidence does not establish that these documents refer to the Agreement instead of the document signed by Higgins. Moreover, the substance of these documents indicates that they are not based on personal knowledge of the subject matter, are clearly based on hearsay, and are speculative. These documents appear to relate to the purported affiants' personal understanding of the parties' intent. However, the purported affiants are not parties to the Agreement and, as such, their understanding or intent is irrelevant. *Burkhardt*, 260 Mich. App. at 655.

Naser argues that Lexon paid the Claims in "bad faith," however, this argument is actually an affirmative defense which Naser did not raise in his first responsive pleadings. Therefore, the defense is waived. *Jones v. Bock*, 549 U.S. 199, 212 (2007) ("Rule 8(c) identifies a nonexhaustive list of affirmative defenses that must be pleaded"); *see also Trav. Cas. & Sur. Co. of Am.*, 479 Fed. Appx. at 689-91 (holding that breach of the duty of good faith is an affirmative defense that is waived if not raised in responsive pleadings). Naser

13

argued at trial that the Court held that "bad faith" is not an affirmative defense in the Court's order denying Lexon's motion in limine. However, this Court's order did not address that point, but rather denied Lexon's motion seeking to preclude evidence regarding that argument based on Naser's failure to disclose, produce, or supplement documents relating to this argument. Further, Naser did not move to amend his pleadings to add this affirmative defense or otherwise place Lexon on notice of this defense prior to the close of discovery. To allow Naser to assert this affirmative defense at trial would essentially deprive Lexon of the notice and opportunity to refute this defense.

Nonetheless, even if Naser did not waive his affirmative defense of "bad faith," he has failed to meet his burden. In *Trav. Cas. & Sur. Co. of Am.*, 479 Fed. Appx. at 690, the Sixth Circuit Court of Appeals addressed the affirmative defense of "bad faith" and stated that "as an affirmative defense, Appellants bore the burden of pleading and substantiating the issue to place it in dispute." Naser does not dispute that CMS issued claims against Lexon's bonds. Rather, Naser's position is that Lexon should have denied those claims based on Naser's speculation that Lexon could have refuted that MOS received Medicare reimbursements for services that were not rendered. To that end, Naser argued that Lexon shoud have obtained patient medical records and corresponding payment records from MOS' to verify that the post-pay probe by the Medicare PSC was correct. However such patient information is protected by HIPPA and Lexon had no legal basis upon which to obtain such information during the 30 day period in which Lexon had to pay CMS' claims. There is also no dispute that Naser did not offer any evidence to establish that MOS provided the services for which it sought and received reimbursement despite having the ability during this lawsuit to demand such information by way of subpoena or deposition.

14

Moreover, Naser's basis for asserting that Lexon should not issue payment is speculative considering Naser admitted to having no personal knowledge or documentary evidence about the Claims.

Lexon acted in good faith in paying the Claims. When faced with the Claim, Lexon contacted Naser and requested any evidence to support any defense to the claims. The Agreement does not require notice of claims to trigger the indemnity obligations. In response, Naser apparently did nothing other than request that Lexon not issue payment. Thus, Naser's argument is that Lexon should have denied CMS' claims in bad faith triggering Lexon's liability under the bonds and possible impacts to its business operations as a surety to the United States.

The Court finds that the parties intended for Naser to sign the Agreement in his individual capacity and that Naser did, in fact, sign the Agreement as an individual, which required him to personally indemnify Lexon for the Claims.

## IV.    CONCLUSION

Accordingly, IT IS ORDERED that judgment will be entered in favor of Plaintiff, Lexon Insurance Company, and against Defendant Aziz Naser, in the amount of $256,913.64, plus attorney fees, interest, and costs to be awarded in a post-judgment motion per the stimulation of the parties and this Court's Order.

SO ORDERED.

Dated: April 16, 2014                    _____/s/Gershwin A Drain_____ __
                                         GERSHWIN A. DRAIN
                                         United States District Judge